This court is now in session. You may be seated and the clerk will call the next case. 3-14-0-4-4-3 The people of the state of Illinois, faculty by Justice Nicolosi v. Maurice Sargent, appellate by Demetri Goulfos. Mr. Goulfos, you may proceed. Good afternoon, your honors. Demetri Goulfos, assistant appellate defender on behalf of Maurice Sargent, the defendant appellant. May it please the court, counsel, Mr. Sargent was convicted of one count of forgery after a jury trial. The conviction stemmed from his attempt to cash a counterfeit MoneyGram money order at a check cashing facility in Peoria. There is only one issue before the court today, and that's whether the evidence at trial was sufficient to convict him of forgery. To convict Mr. Sargent of forgery, the state had to prove that he knew that this money order was counterfeit at the time he presented it for payment. The state failed to prove that. Knowledge is defined by statute as an awareness of the substantial probability that the fact exists. What that means is proving that Mr. Sargent was aware of the possibility that the money order was fake, or even that he should have known or that a reasonable person should have known that the money order was fake is not sufficient to prove knowledge. Turning to the evidence of this case, I want to, at the outset, disclose additional facts that I noticed in preparation for oral argument that is not in the statement of facts in my brief. I believe it's necessary for a full and fair understanding of the facts of this case, and I spoke to Mr. Nicolosi earlier this week about it. If you look at the top of the money order, that's an issue. At the top, the small lettering is the phrase, hear sensitive, red stop sign. I believe that to be a misspelling. It should be heat sensitive as opposed to hear sensitive. With that said, I think that fact is actually helpful to Mr. Sargent's case, and it proves a point that I want to make, and that's that the state's case is, to a large degree, based on some assumptions. And one of those assumptions is that Mr. Sargent could have, should have, and did notice everything that was wrong about this money order. That assumption is actually defeated by the fact that the state's own trial expert, who had every opportunity to look at this money order and scrutinize it before offering an opinion as to its legitimacy at trial, failed to notice everything that was wrong with it. This expert, the attorneys below, and the appellate prosecutor on appeal all failed to notice that there's a typo on this money order. As did you. As did I until just recently. The money order upon casual inspection looks legitimate. The expert even testified that it looks similar to legitimate MoneyGram money orders. So we can't just assume that Mr. Sargent saw everything that was wrong with this. The state had to prove his knowledge with actual evidence, and it didn't do that. As to give some examples, there is no evidence in this record as to the amount of time that Sargent spent looking over this money order and how he scrutinized it, if at all, aside from asking other people whether they thought there was anything wrong with it. There is no evidence of record that he identified the heat-seeker science security device, or if he did, that he even attempted to see whether it worked. There is no evidence of record that he saw the misspelling. And again, it's in small writing and it's so inconspicuous that no one else saw it in the court below. The only other thing on this money order that reveals that it's a fake document, according to the expert, is that the coloring is off. Well, in order for Mr. Sargent to know that the coloring is off, he would have had to have known what a legitimate MoneyGram looks like. There's no evidence in the record that he did, so we can't say that he knew that this money order was fake because the coloring is off on this record. Simply put, the fact that there's certain things wrong with this money order that indicates that it's fake is not probative of Sargent's mental state. The only other things that the state points to in this brief that it says demonstrates that Mr. Sargent knew that this money order was fake at the time he tried to cash it are, number one, that before he tried to cash it, he sought the opinion of others as to whether it was real, and number two, that after he tried to cash it, he fled tax broke. With respect to him seeking the opinion of others, the state argues in this brief that this is strong evidence of the fact that he thought, quote, something was odd about the situation. Well, that actually rebuts the notion that he knew it was counterfeit. If he thinks something is odd about the situation, and as a result, he's looking for the opinion of others as to whether it's real or it's fake, that shows he doesn't know whether it's real or it's fake. He sought the opinion of others because he didn't know. Again, I can't stress enough that the state in this case has to prove knowledge. It has a very specific meaning, awareness of the substantial probability that the fact exists. Just showing that he entertained the idea that it could be fake is not good enough. On top of that, there's no evidence in this record as to what the people whose opinion he sought told him. There's no evidence that they said, hey, yeah, we don't think this is real. There's no evidence of that. So I would submit that the fact that he sought the opinion of others doesn't demonstrate knowledge. What this case really comes down to is whether Mr. Sargent's flight from tax parole is sufficient to demonstrate knowledge. And it's not. Flight alone does not demonstrate guilt. And the reason for that is, although flight may be evidence of consciousness of guilt, flight is also consistent with innocence. Innocent people flee for reasons other than consciousness of guilt. And as the Supreme Court of the United States made perfectly clear in Hickory v. United States in the lengthy discussion, one reason why people flee is they're fearful of encountering the police and dealing with them and even going to stand trial even when they're innocent. And that's consistent with what Mr. Sargent did in this case. The state in this brief argues that, well, Mr. Sargent's flight is not consistent with innocence because he was only asked a single, innocuous, non-confrontational question that wouldn't cause an innocent person to flee. That's not what actually happened. That's not even viewing the evidence in the light most favorable to the state. What actually happened here was that Mr. Sargent turned over the money order and his ID, he waited about one minute, and then he was asked not just one question but a lot of questions. We don't know what all those questions are, but we know that the first question was, do you have any more of these money orders? After being questioned, he was then told to sit down. And it wasn't until after all that that he fled. Now, anyone who has ever cashed a monetary instrument before knows that how Mr. Sargent was received at tax parole isn't what normally happens. He was interrogated, and I think we can all reasonably infer that the reason why he was told to sit down was so that he would remain there for law enforcement to arrive. He had an innocent reason to flee. And because of that, the evidence of his flight alone is not sufficient to prove knowledge. The evidence in this case was insufficient, simply proving that Mr. Sargent was aware of a possibility that this money order was fake before he went to go cash it. It's not proof that he knew it was fake when he tried to cash it. So we would respectfully request that Your Honors reverse this conviction outright. And at this time, I would entertain any questions that the Court would have. Thank you, Your Honors. Mr. Michalowski. Thank you. Good morning, Your Honors. May I please the Court, Counsel? Your Honors, the key question here is, of course, is knowledge, what the defendant knew at the time he went to the counter with this money order. And the people must stress strenuously that this is not a retrial. This Court is not a trier of fact. We are not to rehash all the evidence for this Court to make a determination on whether the people proved beyond a reasonable doubt. What we need to figure out right here, the standard of review, is whether or not any rational jury could have found the defendant guilty, given the evidence presented. And the people submit that this jury was clearly rational and that any rational jury could have convicted the defendant of forgery. And that's based on the totality of the circumstances surrounding this document and its presentation and the defendant's flight from the premises. First, we have the dubious production of this document that should have triggered something within the defendant's curiosity. And the people would submit that it did trigger, based on the fact that he sought the opinions of three people as to whether or not this document was real, because he didn't know. So if he didn't know, I mean, if you know it's fake, why would you ask things like that? But if you, who just goes and asks three people? You know, if this document was produced under non-suspicious circumstances, you know, this document was created or produced by a man this defendant didn't even know. He couldn't even give the detective any details of this Lamar Nixon person. So this is a person who just produces this document. Lamar testified that this thing was mailed to his sister. The defendant testified to something completely different, that Lamar got this from his aunt for his birthday, but didn't even put any identification regarding Lamar on this document. Those are suspicious circumstances. And the defendant obviously thought this was fishy, or else he wouldn't have gone to three different people. That's just the start. That's not a stand-alone fact that we're going with. We've got to move forward here. And the fact that he goes to, he tried two different places with this document. They wouldn't cash it. Then he goes to TaxPro or Get Her Done, and he presents it to the clerk there, the employee, Mr. Bricker. With his ID, and regardless of how many questions there were, the fact remains the defendant testified that it was the question of, do you have any more of these? And then he was asked to sit down, and that triggered his flight from the premises. People would submit, as I argued pretty strenuously in my brief, that these aren't the kind of questions that would trigger an innocent person to flee the premises, especially without his ID. If the question, do you have any more of these, was asked to an innocent person, I truly believe, and obviously I think the jury truly believed, that they would have gotten to a conversation with the employee, asked what he was talking about. The employee didn't say he was calling the police. He didn't say this is a forgery, this is a false document. There was no testimony that any of the questions had anything to do with accusing this defendant of anything. The people would submit that the fact that he left, based on this non-accusatory line of questioning, pointed to his consciousness of guilt at that moment. The jury saw that, they saw this, again I keep using the word dubious production, because I believe the evidence shows that this was produced under very questionable circumstances, by very questionable individuals, and that the fact that he flew from the premises based on this very light questioning, shows what his mental state was at the time that he presented this document. Counsel was talking about flight alone, whether flight alone is good enough to prove his state of mind, and again the people would submit that this is not flight alone. That's not a stand-alone fact. We have the production of this document, the fact that he had asked three people whether or not this document was legit, all shows that this was a situation where there was a lot of questionable activity going on. Any of those people advise him that it didn't look real? I don't think, it didn't sound like he got strong advice from anybody at this point, because at that point when they went to the store, Lamar Nixon testified he still didn't know when they went to the store whether or not it was real. So I don't think anything was solidified at that point at all. And again, you can point to the defendant's flight after all of this activity, as evidence that he didn't believe it was real at that point. Otherwise, why are you leaving in a haste from this location, and why are you going without your activity? For defense? Does it matter what he thinks after it's presented and they ask him questions? Doesn't it matter what he thinks before? Of course, of course. But again, I think you can consider it all, Your Honor. And I think the jury, again, this is not a retrial. The jury considered this evidence. They heard the witnesses. I mean, the element isn't after you present that you discover it's not real, isn't it? At the time you present it, you know it's not real. Yeah. But I think the fact that, again, there's no accusatory questions here. Where's the, I'm calling the police, this is a forgery, did you know it was a forgery? None of these questions were asked to the defendant. Well, even Lamar Nixon said he didn't know at the time they went. Okay. But not knowing if it's real isn't the same as knowing it's not real. Your Honor, I understand that. But, again, we're pointing to the totality of the circumstances here. It was the jury that heard all these witnesses. We can't, we can't, there's strong deference to their finding of guilt in this case. They saw the way this document was produced. They saw that the defendant had to ask people whether or not it was real. So, again, why would you have to go out and ask people if it was real, if it wasn't presented in extremely questionable circumstances? These all add up to the mental state that he had when he walked into this place. And the fact that he left in a haste, I think, proves, as I wrote in my brief, that he was spooked by any kind of questions at this point because he knew when he walked in there that this thing was fake. And that's why this very light, very innocuous questioning forced him to leave. I think if you walk in with a clean state of mind, an innocent person, at the sign of this questioning would have gotten to a conversation with the employee as to what the heck he was talking about. He was ready to leave at the first sign of any kind of struggle, of any kind of disagreement here. And that's why him fleeing so abruptly shows, that highlights his state of mind at the time he entered that building. And again, the jury heard all of this. They heard the witnesses, they saw the evidence. They're the only party in this that is in the position to judge the credibility of witnesses, weigh the evidence. They found him guilty. And the people strongly submit that this is not a verdict that's so unreasonable or improbable or unsatisfactory so as to leave doubt. The jury was not required to abandon their common sense. And they saw the totality of the circumstances. And they found that he knew what he was doing when he walked into that check-cashing facility. Does the record indicate why the document was not cashed at ShopRite and Kroger? I don't believe so, Your Honor. Was it the defendant that presented it at Kroger? Yes. I think so because I think Lamar Nixon testified, or he said he didn't remember even going to those places. So I believe the answer is yes, but don't quote me on that. So how do you think that factors into defendant's knowledge? Twice he was unable to cash it. I would think it would add support to the jury's finding that those other locations, the Kroger and the ShopRite, they didn't cash it, that there's probably something wrong with this document. And if it was a legit document and those are places where you cash money orders, then if it was legit, they probably would have cashed it. But because it wasn't, he tried his third attempt. I think that supports the jury's finding, Your Honor. With that, the people would respectfully submit that this court affirms the defendant's conviction and sentence. And if there are any other questions, I'd be happy to answer them. May I make just a quick comment? I appreciate that you cooperated with counsel in not objecting to him revealing additional facts. You certainly could have. I just know you guys have a good working relationship between your agencies, and I appreciate that. Thank you. We didn't find any reason to make that a bigger issue than it is. Thank you. Mr. Goldberg? So as you walk up here, I'll also say it. I know you guys write these briefs, you know, weeks, months ahead, and so it's obvious you were both preparing well for arguments. That's also appreciated. Thank you. Just very briefly, just getting to the question that Justice Wright asked Mr. Nicolosi about whether there's any evidence as to who went to these 12 other places and what happened. We know that they tried to go to two other places. We don't know why they weren't able to catch them there. Do we know who presented them at ShopRite and, I want to say, Kroger? It could be wrong. ShopRite and Kroger. Correct. We don't know. We know that Lamar Nixon testified that he didn't recall going there, but in terms of whether he did and if he did, who went inside and who tried to do it, we don't know. We don't even know why they weren't able to. We don't know if someone there said, hey, this isn't real, we're not going to catch it. We don't know if they just didn't catch documents there. If you look at Mr. Sargent's written statement, which the state's case largely rests on statements that he made, so there's really no other way to interpret it to take this and line it up any other way. But he said that we first looked at Kroger first, but we didn't catch money orders there. That seems to indicate that he wasn't confronted with the situation saying, oh, this isn't real, we're not going to do this, but we just didn't do it at all. Went to ShopRite, we had no luck. Don't know what that means. So I don't really think it's fair to say that we can reasonably infer that he went to all these places and because he didn't catch them there, he should have known that they were fake. We don't know why he was declined. Council talks about a non-accusatory line of questioning. Again, he wasn't just asked one question. He was asked a lot of questions. And then he was told to sit down. And I'll go back to the point that I made before. We've all been to banks to go cash checks, money orders, whatever. And you go there, you turn it over, you give them your ID, you identify them with your account number. They run a transaction and they say you get the money, they say goodbye. You're not questioned. You're not told to sit down. You're not asked, hey, do you have any more of these? So I think any person in those circumstances would know this isn't going how it normally goes. There's something wrong here. So he did have a reason to flee. He had a reason to be fearful. Council talks about how this is a suspicious circumstance because someone that he didn't know gave him a money order and asked him to cash it. That's not entirely accurate. Mr. Sargent and Lamar did know each other for a few months. And at the time, at least, Mr. Sargent viewed Lamar as a friend. Don't really know if that's true now. But the final point I want to make is regarding the fact that the record doesn't show Mr. Sargent getting strong advice from anyone as to whether this is real or fake. I would just note that Mr. Sargent did try to introduce evidence as to what he was told, but he wasn't allowed to introduce that at trial. So unless the Court has any further questions, we would again request that you reverse this conviction offer. Thank you. Thank you. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. Right now, I'll stand recess until 1.15. Good night. Court is in recess.